UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| Kevin O'Banyoun, | § | CIVIL ACTION NO. _____ |
|     Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| AKAL Security, Inc. and Loretta Lynch, | § | |
| Attorney General of the United States, | § | |
|     Defendants | § | A JURY IS DEMANDED |

## ORIGINAL COMPLAINT

If Kevin O'Banyoun had been judged on the quality of his work, he would still be serving as a Lead Court Security Officer and protecting the public and the federal judiciary of the Southern District of Texas. His work was recognized as excellent before he was dismissed. Although he performed his job as a Lead Court Security Officer with distinction, he lost his job because of disability discrimination and inflexible attitudes toward officers who have overcome disabilities.

PARTIES

1. The plaintiff Kevin O'Banyoun is an individual who resides in Corpus Christi, Nueces County, Texas.

2. The defendant Akal Security, Inc. is a New Mexico corporation doing business in Texas, and may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

3. The defendant Loretta Lynch is currently the United States Attorney General and may be served with process at her business address, Office of the Attorney General, Department of Justice, 950 Pennsylvania Ave., N.W., Washington, D.C. 20530-0001. A copy of this complaint is also served on the United States Attorney for the Southern District of Texas.

1

## JURISDICTION

4.      This case is brought under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.  This Court has jurisdiction of this case according to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

5.      Venue is invoked pursuant to 28 U.S.C. § 1391.

## STATEMENT OF THE PLAINTIFF'S CASE

6.      The plaintiff, Kevin O'Banyoun, is well qualified to protect the federal judiciary. Before becoming a Court Security Officer, he served in the New York City Police Department for 22 years, rising to the rank of Lieutenant.  During his time in the NYPD, he received numerous medals and awards for his meritorious and excellent service in the line of duty and for his two decades of perfect attendance on the job.

7.      After 22 years of service with the NYPD, Mr. O'Banyoun was able to retire with full pension benefits and move to Corpus Christi, Texas, a city he had loved since he had first visited Texas decades before.  Here, he continued his excellent law enforcement work.  Akal hired him as a Court Security Officer (CSO) in January of 2002.  Akal contracts with the USMS to provide court security officers at federal courthouses, including the federal courthouse in Corpus Christi, Texas.

8.      Once again, Mr. O'Banyoun's excellent work led to a promotion, this time to Lead Court Security Officer in 2012.  Mr. O'Banyoun held this position until he was terminated on May 9, 2014.

9,      Before he started working for the Marshal's Service, Mr. O'Banyoun was informed that he needed to undergo a physical in connection with his job.  He took the physical and was thereafter put to work as a Court Security Officer at the federal courthouse in Corpus Christi, Texas.

2

For 12 years, he complied with Defendants' requirement that he submit to an annual fitness for duty examination, and each year, he passed. This was consistent with his job evaluations, which were stellar. There was never any issue whatsoever regarding Mr. O'Banyoun's qualifications for the job, and his work performance always demonstrated his ability to perform his essential job functions.

10. All that changed in October 2013, when Mr. O'Banyoun was suspended from his job as Lead Court Security Officer, not because of any performance problem, but because of a disability which had no effect on his job performance. Mr. O'Banyoun has, and has had for more than 20 years, an atrial fibrillation. Long ago, his physicians prescribed the anticoagulant Coumadin (warfarin) to manage this condition. When hired by Akal as a CSO, the USMS and its physicians knew he had been managed with warfarin for years without any side effects. For 12 consecutive years, Defendants found him fit for duty even as he successfully managed his condition with warfarin. He also performed all the essential functions of his job during all of those 12 years. Both Akal and the USMS were aware of Mr. O'Banyoun's medical condition, were aware that he was highly qualified to serve, and were aware that his use of Coumadin allowed him to successfully manage his condition.

11. USMS and Akal branded Mr. O'Banyoun as unsafe and at serious risk for bleeding on the job, without consulting with any expert in cardiology regarding Mr. O'Banyoun's abilities. Despite the examining physician's determination that Mr. O'Banyoun was fit for duty, Defendants decided otherwise. The USMS physician made the recommendation to remove Mr. O'Banyoun from the job despite knowing that he had successfully managed his condition with warfarin for more than *two decades* without any issues or risks. Akal complied with the USMS directive and suspended Mr. O'Banyoun on October 10, 2013.

12.     After suspending Mr. O'Banyoun, the USMS requested additional medical tests, which Mr. O'Banyoun complied with even though they were not appropriate. Again, those tests confirmed that Mr. O'Banyoun was able to perform his job. He suffered wage and benefits losses due to this suspension. Finally, after five months, on March 6, 2014, the defendants allowed him to return to work.

13.     Yet only four days later, on March 10, 2014, Mr. O'Banyoun received yet another demand from the USMS. This demand was for more unlawful medical examinations under the ADA and the Rehabilitation Act. This demand came despite the fact that Mr. O'Banyoun's examining physician in Corpus Christi had just found him fit for duty. This new demand singled Mr. O'Banyoun out among CSOs who had been found fit for duty by the examining physician and required that he obtain a lengthy new report from his physician specifically addressing dozens of USMS questions about his condition and medication. None of these questions arose out of any alleged issue with the ability to perform all the essential functions of the job, for Defendants admit that every day he worked, Mr. O'Banyoun was qualified to perform his job, and did perform his job admirably at all times.

14.     The USMS also required that Mr. O'Banyoun take a Bruce protocol cardiac stress test. Mr. O'Banyoun was told that unless he provided this information by April 5, 2014, he would be terminated on the basis of the USMS's perception that he had a high risk of bleeding and was a danger to himself and others. Because Mr. O'Banyoun was sick with pneumonia at the time Defendants made their demand, he requested an extension to take the stress test and provide the information, but Akal denied this request, and directed him to Akal's "Frequently Asked Questions",

which states, point blank, that no extensions of any deadlines will be considered.[1] Mr. O'Banyoun once again worked diligently to provide the information the USMS required, and his physician once again confirmed that he was able to safely perform all the essential functions of the job. Defendants disregarded this certification, and instead decided to terminate him from his CSO position, based solely on the results of a stress test that revealed no heart disease.

15.     Instead of simply accepting this repeated confirmation that Mr. O'Banyoun was fully able to do his job, the reviewing USMS physician chose to disqualify him anyway and require his termination. The USMS did so in a startling fashion. Having flogged the issue of Mr. O'Banyoun's medication and bleeding risk for months, it then abruptly changed course and claimed that his heart condition made him *unable to perform the physical requirements of his job*, despite the obvious fact that Mr. O'Banyoun had never had any issues with his job performance on the job. This determination by the USMS was made based on the result of a stress test that O'Banyoun took while he had pneumonia. It was no mystery that his endurance was impaired. The determination of the USMS physician was explicitly contradicted by Mr. O'Banyoun's treating specialist, who found him fit for duty, but the USMS, physicians who have no expertise in cardiology, overruled the treating specialist's conclusions. Non-experts overruled the experts to create this calamity. The USMS utterly failed to take into account Mr. O'Banyoun's proven ability to perform his job. The USMS gave him no opportunity to contest this determination, submit additional information, or take another test when he wasn't sick with pneumonia; it simply ordered him removed from his position as LCSO

---

[1] The USMS for its part states that it has no such policy, and that had Akal asked it for an extension on Mr. O'Banyoun's behalf, that it would have been considered, and that the USMS has regularly granted such requests.

5

in Corpus Christi. Akal terminated Mr. O'Banyoun the same day it received the USMS determination, May 9, 2014.

16.     The government physician who made the recommendation to disqualify Mr. O'Banyoun recorded on an official form that he had an "inability to respond to the physical requirements of the job" due to his heart condition. The physician, who is no expert in cardiology or the treatment of heart conditions, acknowledged that Mr. O'Banyoun's treating specialist, who *is* an expert in cardiology, had come to the opposite conclusion and that Mr. O'Banyoun's disqualification was solely based upon her interpretation of a single Bruce protocol stress test. Paradoxically, the government has acknowledged that these stress tests are not used for assessment of functional capacity or for overall physical fitness. The USMS does not test CSOs for their endurance at all. Instead, they claim to use stress tests to diagnose serious heart conditions that might make the officer a direct threat and therefor not qualified to serve. What is clear is that Defendants' medical qualification standards screen out individuals with disabilities and therefore violate 42 USC 12112(b)(3).

17.     It was illegal for the defendants to demand that Mr. O'Banyoun provide additional medical information and take additional medical exams. These demands were first made during Mr. O'Banyoun's suspension. New illegal demands were then made after his reinstatement, including the demand for the Bruce protocol stress test which resulted in his termination. These demands constituted unlawful medical examinations as they were neither job-related nor consistent with business necessity. Rather, they were based upon the mere fact that the plaintiff took Coumadin, without any consideration of his medical history or his demonstrated ability to perform the essential functions of his job. This is illegal under the ADA. See 42 U.S.C. 12112(d)(4)(A).

18. Even though Akal Security knew that Mr. O'Banyoun was eminently qualified to continue working as a CSO, it fired him based on his disability because it has surrendered the right to do so to the USMS. Specifically, Akal Security surrendered its employee to disability discrimination by virtue of its contractual arrangement with the Government. This is per se unlawful discrimination under the ADA. See 42 U.S.C. 12112(b)(2).

Disability Discrimination

19. The plaintiff is a qualified individual with a disability. The plaintiff performed his job as a Court Security Officer with distinction, but was fired because of a disability. He has an actual disability as he was assessed by Defendants. He was regarded as having a disability (based on its defendants perception that he was substantially limited in his cardiac function and blood clotting ability) by them, and was discharged because of a record of a disability. Akal Security's conduct violates the Americans with Disabilities Act, which prohibits discrimination in employment on the basis of disability. See 42 U.S.C. 12112(b)(2). Specifically, Akal Security cannot contract out of its obligations under the disability law by allowing the government to make a decision that is illegal under the ADA and then blindly going along with it. Lynch's conduct violates the Rehabilitation Act, which also prohibits disability discrimination. The Government cannot legally require a medical test as it did here, unless such a test is job related and justified by business necessity, which it most certainly was not. The plaintiff is a qualified individual with a disability and was discriminated against because of such disability.

20. In first suspending Plaintiff for five months and then terminating him only two months after his reinstatement, the Defendants have violated the ADA and the Rehabilitation Act, respectively. These statutes prohibit an employer from using unlawful medical examinations or

otherwise discriminating on the basis of disability. 42 U.S.C. 12112(a), (d)(4)(A) and 29 U.S.C. 791 et seq. Defendants' conduct in suspending Plaintiff from his work constitutes discrimination in employment on the basis of a disability or perceived disability or the record of a disability. Finally, Defendants' conduct in discharging Plaintiff constitutes discrimination in employment on the basis of a disability or perceived disability or the record of a disability. Akal's refusal to accommodate his need to extend the time for completing the stress test was likewise unlawful, and contributed to his firing, since the USMS admits that it would have granted the extension had Akal informed it of the need for the extension.

21. The plaintiff timely filed a charge of discrimination to challenge the disability discrimination he suffered by Akal Security and Lynch. He has requested a right to sue from the Equal Employment Opportunity Commission on his charge of discrimination against Akal Security and such right to sue letter has been issued. Plaintiff timely files this lawsuit to vindicate his rights. In addition, the plaintiff has received a right to sue letter from the Equal Employment Office of the Justice Department on his claim against the federal government and timely files this lawsuit to vindicate his rights.

## Damages

22. The damages suffered by the plaintiff include lost wages and benefits as well as compensatory damages for the injuries suffered at the hands of the defendants, including, but not limited to, mental anguish.

23. Further, because Akal Security's actions were of the sort that render the imposition of exemplary damages appropriate, the plaintiff is entitled to an award of these damages, which he seeks.

## RELIEF REQUESTED

The plaintiff asks this court to enter a judgment:

1. Declaring that the acts and practices complained of in this Complaint are in violation of the Americans with Disabilities Act and the Rehabilitation Act of 1973;

2. Enjoining and permanently restraining these violations of law;

3. Directing the defendants to pay the plaintiff actual and compensatory damages that he suffered, past and future;

4. Directing the defendants, to pay plaintiff exemplary damages for its conduct in an amount as yet to be ascertained;

5. Awarding plaintiff pre-judgment interest on the amounts owed at the maximum rate allowed by law;

6. Awarding plaintiff the costs of this action, together with reasonable attorneys' fees and expert witness fees;

7. Awarding plaintiff post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

8. Awarding plaintiff such other relief, legal or equitable, as may be warranted.

Respectfully submitted,

/s/ John W. Griffin, Jr.
**JOHN GRIFFIN, JR.**
Federal I.D. No. 2238
State Bar No. 08460300
203 North Liberty Street
Victoria, Texas  77901
(361) 573-5500 – Telephone
(361) 573-5040 – Telecopier

**Attorney in charge for Plaintiff**

**Katherine L. Butler**
Federal I.D. No. 4734
State Bar No. 03526300
Margaret A. Harris
Federal I.D. No. 87
State Bar No. 09081400
1007 Heights Boulevard
Houston, Texas 77008
(713) 526-5677
Fax (713) 526-5691